# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRANDON MORRIS, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. CCB-18-2131 |
| WARDEN FRANK B. BISHOP, JR., | * | |
| Defendant | * | |

## MEMORANDUM

Plaintiff Brandon Morris, an inmate at North Branch Correctional Institution (NBCI), filed the above-captioned civil rights action challenging his continued placement on administrative segregation. ECF No. 1. Defendant Bishop filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 14, and Morris filed a Response in Opposition, ECF No. 16. The Motion is now ripe for review. The Court finds a hearing in these matters unnecessary. *See* Local Rule 105.6. For the reasons that follow, Bishop's dispositive Motion, construed as a Motion for Summary Judgment, will be GRANTED.

## BACKGROUND

### A. Morris's Complaint

In its entirety, Morris's Statement of Claim is as follows:

> I've been in solitary confinement since 1-26-06 for infractions on said date. Per correctional service article 9-616[c][3], since I've no other infractions renewing or prolonging Ad Seg time I'm no longer a risk to general population. Frank Bishop approves my Ad Seg because the victim of my crime was a fellow coworker, friend. It's a personal vendetta and not by policy.

ECF No. 1 at 2. As relief, Morris requests that his "administrative segregation solitary confinement" be terminated and that he be "transferred to general population at an out of state prison[.]" *Id.* at 3.

## B. Bishop's Motion & Exhibits

Bishop has filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, in which he argues that he is entitled to judgment in his favor because Morris has not exhausted the administrative grievance process; Morris's placement on administrative segregation does not implicate a protected liberty interest triggering due process protections under the Fourteenth Amendment; Morris has failed to allege facts to support an Eighth Amendment conditions of confinement claim because he has not alleged that he suffered a serious injury; and Morris's assertions that Bishop is retaliating against him due to a personal vendetta are conclusory and unsupported by the evidence.

In support of his dispositive Motion, Bishop has submitted several exhibits. These documents reflect that in 2006, while incarcerated at Roxbury Correctional Institution (RCI) on unspecified charges and receiving medical treatment at a local hospital under the custody of Officer Wroten, Morris took Wroten's service revolver and shot Wroten in the face, causing injuries from which Wroten died several days later. ECF No. 14-3 at 6, 9-10, 12. After shooting Wroten, Morris fled with the revolver and "took a hospital visitor hostage and then carjacked a taxi." *Id.* at 12. Morris was later convicted in state court of first degree murder and other charges related to the incident and sentenced to life imprisonment without the possibility of parole plus 301 years. *Id.* Following an institutional hearing, he was also found guilty of several rule violations stemming from the incident and sanctioned with six years of disciplinary segregation. *Id.* at 8-10.

Between October 2009 and September 2014, Morris was incarcerated with the New Mexico Corrections Department pursuant to an Interstate Corrections Compact (ICC) Agreement. *Id.* at 2; ECF No. 14-4 at 2. After threatening and harassing correctional staff members, New Mexico requested that Morris be returned to Maryland. ECF No. 14-4 at 2. Morris was returned

to North Branch Correctional Institution (NBCI) in September 2014, where he remained until December 2014. ECF No. 14-3 at 2. At that time, he was placed with the Federal Bureau of Prisons (BOP) pursuant to a corrections agreement. *Id.*; ECF No. 14-4 at 3. However, Morris was again returned to NBCI in February 2016, after the Federal BOP indicated that it was "unable to continue to house him due to his extensive management and mental health concerns" and the fact that he "require[d] specialized housing" which was in limited supply. ECF No. 14-4 at 3.

Once Morris returned to NBCI, he was placed on administrative segregation. ECF No. 14-3 at 12-14. According to a memorandum from NBCI's assistant warden, "[d]ue to the nature of the [2006 murder of Wroten and related crimes] and the inmate's action[,] inmate Morris should be listed dangerous to protect the safety of staff and other inmates." *Id.* at 12.

In October 2016, Morris was charged with staff assault and other offenses after throwing a liquid substance on a corrections officer. *Id.* at 21. He refused to participate in the disciplinary hearing, and was found guilty of the charged violations in absentia. *Id.* at 22, 25. Based on the guilty finding, Morris was sanctioned with 120 days of disciplinary segregation, which was effective from October 19, 2016 through February 15, 2017. *Id.* at 4, 26. After Morris's disciplinary segregation concluded on February 15, 2017, he was returned to administrative segregation. *See id.* at 38 (stating that Morris was assigned "CM-WJ-Segregation-Administrative" effective February 15, 2017).

Bishop has also submitted copies of the annual certification for Morris to remain on administrative segregation/special confinement housing. On February 8, 2017, the administrative segregation team recommended that Morris "be continued on Admin Seg until transferred out of state," citing Morris's conviction and his disciplinary infractions. *Id.* at 13. This recommendation was approved by Headquarters on March 3, 2017. *Id.* Another recommendation was submitted

the following year on February 7, 2018; it appears that the recommendation was approved, though no date is provided. *Id.* at 14. Bishop has submitted the monthly reviews of Morris's administrative segregation/special confinement housing occurring between February 2018 and August 2018, which note that the Department of Public Safety and Correctional Services is attempting to find another state to accept Morris under an ICC Agreement. *Id.* at 38-51.

Further, Bishop has submitted an affidavit stating that he did not make decisions regarding Morris "as part of a personal vendetta," explaining that he "did not work at the Roxbury Correctional Institution when Inmate Morris escaped and murdered Officer Wroten" and "did not have a personal relationship with Officer Wroten." ECF No. 14-6 at 2. Bishop also submitted an affidavit from Samiyah Hassan, an Administrative Officer with the Inmate Grievance Office (IGO), stating that Morris had not filed any grievances with the IGO regarding his administrative segregation status. ECF No. 14-7 at 1.

## C. Morris's Response

Morris filed a Response in Opposition to Bishop's Motion that is much more detailed than his original Complaint. ECF No. 16. In the Response, Morris claims that he has been held in segregation past his segregation end date of February 15, 2017. *Id.* at 1, 3, 5-6. He conclusorily claims that Bishop is retaliating against him because "only the Defendant[']s personal vindictiveness" would cause Morris to be detained beyond his segregation end date. *Id.* at 5. Further, he contends that the monthly and annual reviews of his segregation status are "flawed" and "perfunctory in that they were meaningless" because the case management committee has failed to consider available alternatives as required by the Case Management Manual. *Id.* at 1, 3.[1]

---

[1] Relatedly, Morris's Response argues that prison officials have failed to comply with "new legislation" regarding restrictive housing in prisons. ECF No. 16 at 3, 6. He specifically cites "House bill 786 and SB 539," which appears to refer to legislation that was introduced in the Maryland General Assembly in 2018. *See* House Bill 786, An Act Concerning Correctional Services—Restrictive Housing—Limitations, *available at* http://mgaleg.maryland.gov/

4

As to Bishop's contention that Morris has not demonstrated an injury sufficient to sustain his Eighth Amendment claim, Morris asserts that he has suffered a serious emotional harm. *Id.* at 4. However, as proof of his injury, he cites his diagnosis of and treatment for various mental illnesses during his incarceration outside of Maryland. *Id.* (citing diagnosis and treatment in Leavenworth Kansas in 2008 and 2009, and his "clinical contacts" between December 2014 and October 2015 while he was in custody of the Federal BOP). For the first time in his response, he contends that he fears for his life due to suicidal ideation, that he has asked correctional officers for help with this but they have ignored him, and that he is "in desperate need of [his] medication and treatment." *Id.*

Finally, as to Bishop's exhaustion argument, Morris asserts that he did send a grievance to the IGO but never received a response, and he speculates that "officers were either throwing away my mail or administration was refusing to respon[d]." *Id.* at 2.

## STANDARD OF REVIEW

Bishop's dispositive Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450

---

2018RS/bills/hb/hb0786T.pdf (last visited Apr. 3, 2019; Senate Bill 539, An Bill Entitled An Act Concerning Correctional Services—Restrictive Housing—Limitations, available at http://mgaleg.maryland.gov/2018RS/bills/sb/sb0539F.pdf (last visited Apr. 3, 2019). Although the House of Delegates favorably voted on the bill, the Senate only referred the bill to the Committee on Judicial Proceedings, without taking any further action. *See* HB0786 History, *available at* http://mgaleg.maryland.gov/webmga/frmMain.aspx?pid=billpage&stab=03&id=HB0786&tab=subject3&ys=2018RS (last visited Apr. 3, 2019); SB0539 History, *available at* http://mgaleg.maryland.gov/webmga/frmMain.aspx?pid=billpage&stab=03&id=SB0539&tab=subject3&ys=2018RS (last visited Apr. 3, 2019). Thus, the bill was not enacted into law, and the Court does not consider Morris's arguments in connection with the bill's contents.

(4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Because Bishop has filed and relied on declarations and exhibits attached to his dispositive motion, the motion shall be treated as one for summary judgment.

Summary judgment is governed by Rule 56(a), which provides in relevant part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). Because Morris is proceeding *pro se*, his submissions are liberally construed. *See Erickson v. Pardus*, 551

U.S. 89, 94 (2007). Nonetheless, the Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

## DISCUSSION

### A. Exhaustion

Bishop raises the affirmative defense that Morris has failed to exhaust his administrative remedies. If a claim has not been properly presented through the administrative remedy procedure, it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007); *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirements on a prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant. *See Bock*, 549 U.S. at 215-216 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 219-20. In other words, exhaustion is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S. Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining that "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 725, 729. Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines[.]" *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 90. (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)).

However, the PLRA provides that an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross*, the Supreme Court outlined three circumstances when an administrative remedy is considered "unavailable" and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes,

8

practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has an established "administrative remedy procedure" ("ARP") for use by its prisoners for "inmate complaint resolution." *See generally* Md. Code Ann. (2008 Repl. Vol.), Corr. Servs. ("C.S."), §§ 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.02.28.02(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a). To pursue a grievance, a prisoner confined in a Maryland prison must file a grievance with the Inmate Grievance Office ("IGO"). C.S. § 10-206(a). Depending on the subject of the grievance, additional steps for exhaustion may be necessary.

Here, Bishop argues that Morris has failed to exhaust his administrative remedies, providing an affidavit from an IGO Administrative Officer stating that the IGO has no record of receiving a grievance from him concerning his segregation status. ECF No. 14-1 at 6, 8; ECF No. 14-7. However, Morris contends that he did submit a grievance to the IGO but speculates that it was intercepted and diverted by correctional employees.[2] Given that Bishop offers nothing to refute Morris's contention and accepting Morris's allegation as true, the grievance process arguably was unavailable to Morris for purposes of the PLRA pursuant to the reasoning of *Ross*.[3]

---

[2] Morris alternatively speculates that the IGO received his grievances but "was refusing to respon[d]," ECF No. 16 at 2, but this is specifically refuted by Hassan's affidavit that no such grievances were received by the IGO, ECF No. 14-7.

[3] There are, however, several reasons for rejecting this argument and dismissing Morris's case for non-exhaustion despite the claimed interference. For example, Morris states that he submitted a single IGO grievance about his segregation placement and "waited for a response" to his grievance for three months. ECF No. 16 at 2. However,

9

Accordingly, the Court will not rely on Bishop's exhaustion argument, and will instead turn to the merits of Morris's Complaint.

## B. Substantive Claims

As Bishop correctly notes, the exact nature of Morris's claim is unclear from his Complaint. ECF No. 14-1 at 1 n.1. Therefore, the Court will evaluate Morris's claim both as an Eighth Amendment conditions of confinement claim and a due process claim under the Fourteenth Amendment.

### (1) Conditions of Confinement

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment in violation of the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* "In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce

---

Morris does not state that he made an attempt to follow up regarding the grievance after getting no response such that he would have been able to discover that no grievance had ever been received. More importantly, Morris states that he filed his grievance "within 30 days of [his] 2-7-18 case management review," but fails to explain why he did not file a grievance before this time, given that his problem started no later than February 15, 2017—the date he claims he should have been removed from segregation. *Id.* at 2, 5. However, given Morris's protestation about exhaustion and the fact that this case is easily resolved on the merits, the Court will not rely on the exhaustion argument.

evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).

Long term confinement in administrative segregation does not, in and of itself, amount to an Eighth Amendment violation, a principle discussed in *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471-72 (4th Cir. 1999). Morris has failed to allege that the conditions of his long term administrative segregation are more severe than those at issue in *In re Five Percenters* which were ruled not to violate the Eighth Amendment. Indeed, Morris has provided almost no details about the nature of his ongoing segregation status other than to characterize it as "Ad Seg" or "solitary confinement since 1-26-06." ECF No. 1 at 2. He has not, for example, provided allegations regarding lack of food, inhabitable shelter, clothing, medical care,[4] or exercise. Although he has alleged a depressed mental state, *In re Five Percenters* confirms that, when standing alone, this is insufficient to amount to a "serious or significant physical or emotional injury" as required to state an Eighth Amendment Claim. Because Morris has not pled a particular harm or burdensome condition specific to the terms of his administrative segregation, and the mere fact of confinement on administrative segregation alone is insufficient to establish a conditions of confinement claim, Morris's Eighth Amendment claim must be rejected.

---

[4] For the first time in his response, Morris alleges that:

> During [February 2018,] I was taken off of my mental health medications and denied my bi-weekly mental health reviews. Monthly mental health would come to my cell, in which case I would inform them I would like to, and need to continue both my medication and treatment . . . . The correctional officers were telling the mental health department that I was refusing to come out of my cell to receive my treatment, which is not true.

ECF No. 16 at 2. In addition to the fact that this new claim was not alleged in his Complaint, this allegation is also not sufficient to warrant relief, given that Morris has failed to connect the problem to the sole named Defendant, Warden Bishop. To the extent Morris wishes to pursue an Eighth Amendment claim regarding his medical treatment against an appropriate defendant, he may file a separate action.

11

### (2) Due Process

At the outset, the Court notes that there is apparent confusion over the nature of Morris's current segregation placement. In particular, Morris contends that his administrative segregation was supposed to end on February 15, 2017, and that he has been unfairly held beyond that time. However, the record indicates that he was placed on administrative segregation (special confinement housing) upon his return to Maryland from the Federal BOP in February 2016. ECF No. 14-3 at 13 ("Inmate Morris was transferred back to Maryland from ICC and placed on Administrative Segregation at NBCI on 2/3/2016."). In October 2016, Morris was placed on disciplinary segregation for throwing a liquid substance on a corrections officer. *Id.* at 21-26. This term of disciplinary segregation ended February 15, 2017, at which time Morris returned to administrative segregation (special confinement housing).[5] *Id.* at 26, 38. Thus, Morris's contention that he remains in segregation housing beyond his segregation end date of February 15, 2017, is a misrepresentation; rather, he is on administrative segregation (special confinement housing) after having completed a wholly distinct term of disciplinary segregation. Accordingly, in evaluating the due process claim, the Court will not consider Morris's argument that he should have been returned to general population on February 15, 2017, but will instead only consider whether Morris was entitled to any process surrounding his indefinite term of administrative segregation and, if so, whether he received such process.

Generally, prisoners do not have a constitutional right to demand to be housed in one prison setting versus another. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate

---

[5] It is unclear if Morris was moved to a different cell or his privileges were affected by the change in classification.

12

the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). Under the Supreme Court's pronouncement in *Sandin v. Conner*, the focus on mandatory language in prison regulations was rejected. A liberty interest may be created when state action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" without regard to mandatory language in prison regulations. 515 U.S. 472, 484 (1995). "[G]eneral population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015).

Following the reasoning of the Supreme Court in *Sandin*, the Fourth Circuit rejected a due process challenge brought by Maryland prisoners who were placed on administrative segregation for six months, explaining that

> [t]he applicable prison regulations indicate that the conditions in administrative segregation are similar in most respects to those experienced by inmates in the general population and that even those conditions that are more restrictive are not particularly onerous. Indeed, the differences in conditions specified in the prison regulations appear to be fairly common ones, leading the other courts of appeals to conclude that confinement to administrative segregation does not implicate a liberty interest.

*Beverati v. Smith*, 120 F.3d 500, 503-04 (4th Cir. 1997) (citing decisions from the Fifth, Sixth, Seventh, and Tenth Circuits).

Here, Morris has not alleged that the conditions of his administrative segregation were significantly more onerous than those of general population. *See Beverati*, 120 F.3d at 504 (holding that the conditions of administrative segregation at Maryland Penitentiary do not impose a "significant hardship in relation to the ordinary incidents of prison life"); *Knox v. Lanham*, 895 F. Supp. 750, 758-60 (D. Md. 1995) (increase in correctional security status did not create liberty interest). Thus, he has not demonstrated that he has a liberty interest in avoiding such placement.

13

Even assuming for the sake of argument that Morris did have a liberty interest in avoiding administrative segregation, Morris has actually received process pursuant to the terms of the Division of Corrections' Manual regarding Special Confinement Housing. *See* Division of Correction, Case Management Manual at 102-113, *available at* http://itcd.dpscs.state.md.us/PIA/ShowFile.aspx?fileID=578 (last visited April 11, 2019). Under these terms, initial assignment to administrative segregation requires an evaluation and statement of reasons by the case management team and includes an opportunity for the inmate to respond to the reasons. *Id.* at 104-05. Thereafter, the case management team must review placement on administrative segregation every month and must consider available alternatives to segregation. *Id.* at 105. If an inmate remains on administrative segregation for a year or more, an annual report "detailing the circumstances of the inmate's administrative segregation shall be forwarded to the Director of Case Management for review by the Commissioner, or designee, who may then direct continued administrative segregation, or any other action as appropriate." *Id.*

Morris does not dispute that he has received such monthly and annual reviews of his placement on administrative segregation. Instead, he merely contends that the reviews were "meaningless" because "[t]here is absolutely no evidence that the Defendant considered any available alternative to segregation." ECF No. 16 at 1 (ellipses omitted). However, the exhibits submitted by Morris plainly refute the claim, as they make clear that an alternative—transferring Morris to another state pursuant to an ICC agreement—has been considered and is, in fact, being pursued. *See* ECF No. 14-3 at 13-14, 38-51.

As to Morris's assertion that Bishop is retaliating against him, this is merely a form of a due process argument (*i.e.*, that Bishop is overriding the results of any processes that Morris should receive and imposing his own personal will). As noted above, Morris has failed to demonstrate

14

that he has a liberty interest in avoiding placement on administrative segregation so there is no constitutionally required process with which Bishop might interfere.

In any event, Morris's conclusory assertions of retaliation are plainly without merit. For example, Morris speculates that Bishop allows his continued placement on administrative segregation because Wroten was a "fellow coworker, friend." ECF No. 1 at 2. However, Bishop avers that he did not have a personal relationship with Wroten and did not work at RCI at the time Morris murdered Wroten. ECF No. 14-6 at 2. The fact that Morris was segregated from the general population while he was incarcerated out of state (*i.e.*, away from Bishop's supposed retaliation) further undercuts the idea that placement in segregation is due to a personal vendetta rather than a consequence of Morris's own behavior. *See* ECF No. 14-3 at 33 (report from New Mexico Corrections Department stating that Morris was classified as a "Level VI" inmate, a designation indicating that the inmate's "[i]nstitutional behavior threatens the security of the institution requiring separation from the general population"); *see also* ECF No. 14-4 (letter from Federal BOP official stating that "Morris requires specialized housing" and had "extensive management and mental health concerns").[6] As to Morris's contention that Bishop is retaliating against him because "only the Defendant[']s personal vindictiveness would keep the policies from being enforced" to let him out of segregation on February 15, 2017, ECF No. 16 at 5, the Court has already explained that the February 15, 2017 end date referred to disciplinary segregation, not administrative segregation; thus, there is no policy violation. Finally, the exhibits demonstrate that

---

[6] Morris's Response references a case that he filed in the District of Colorado concerning his time with the Federal BOP. *See* ECF No. 16 at 4. In that case, Morris stated that he "is housed in solitary confinement in the [special housing unit] at USP Florence" and "has no access to a library [or] educational or rehabilitative programs . . . like general population inmates," demonstrating that the Federal BOP also placed him in restricted housing. *Morris v. Rhodes*, No. 1:15-cv-01877 (D. Colo.), ECF No. 1 at 4. Indeed, the reason Morris filed that action was to prevent his planned transfer to USP Florence Administrative Maximum Facility (ADMAX). *Id.*; *see also United States v. Caro*, 733 F. App'x 651, 656-57 (4th Cir. 2018) (summarizing expert testimony concerning ADMAX inmates and security measures).

15

the approval of multiple people—including Bishop's superior, the Commissioner of Correction or her designee—is required for Morris's continued placement on administrative segregation, meaning that Bishop cannot single-handedly continue Morris's segregation placement. ECF No. 14-3 at 13-14, 38-51. Indeed, it does not even appear that Bishop was directly involved in approving the placement, given than none of the administrative reviews were signed by him. *See id.*

Thus, whether construed as one under the Eighth or Fourteenth Amendment, Morris's claim regarding his administrative segregation must be rejected.

## CONCLUSION

For the foregoing reasons, Bishop's dispositive Motion, construed as a Motion for Summary Judgment will be GRANTED. A separate Order follows.

5/8/19
Date

CCB
Catherine C. Blake
United States District Judge